EQUITABLE LIFE ASSUR. SOCIETY OF UNITED STATES v. KEIPER.

Circuit Court of Appeals, Third Circuit. November 24, 1908.)

No. 10.

1. INSURANCE (§ 291*)—LIFE INSURANCE—WARRANTY.

Where an application for life insurance provided that all the statements and answers therein were warranted to be true, the insured warranted the truth of the statements therein contained concerning his history, as to whether he had previously suffered any serious diseases except diseases incident to childhood.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 681–690; Dec. Dig. § 291.*]

2. INSURANCE (§ 291*)—WARRANTIES—BREACH—"SERIOUS ILLNESS."

Insured applied for insurance October 10, 1906, and in his application warranted that he had not had any serious illness or disease, except diseases incident to childhood. It was proved that in 1901 he fell violently ill, so that for a time his physicians expected him to die with what they then diagnosed as hemorrhagic pancreatitis. He suffered from acute pains in the abdomen, and was for some time in a state of collapse; was attended by two physicians and a trained nurse, and recovered after five or six weeks. This sickness followed a chronic stomach trouble with

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

which on several occasions he had been ill. *Held*, that such sickness was a "serious illness," and constituted a breach of warranty.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 689–690; Dec. Dig. § 291.*

For other definitions, see Words and Phrases, vol. 7, pp. 6421, 6422.]

3. INSURANCE (§ 291*) — LIFE INSURANCE — MISSTATEMENTS — "MATERIAL TO RISK."

Act Pa. June 23, 1885 (P. L. 134), provides that, whenever an application for life insurance contains a clause of warranty of the truth of the matters therein contained, no misrepresentation or untrue statement in such application made in good faith by the applicant shall work a forfeiture or defense, unless it relates to some matter material to the risk. *Held*, that a misstatement as to insured's previous history is material to the risk, if a disclosure is necessary and material to the investigation made by the insurer as to the nature of the risk at the time of the application.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 291.*] ·

4. INSURANCE (§ 291*)—MISREPRESENTATIONS—MATERIALITY.

Where insured warranted that he had never had any serious illness or disease except diseases incident to childhood, when in fact, some five years before, he had been ill for five or six weeks, during which time his life was despaired of, such misrepresentation was material to the risk within Act Pa. June 23, 1885 (P. L. 134), providing that a misrepresentation or untrue statement constituting a warranty shall not be a defense unless it relates to a matter material to the risk.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 291.*]

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania. For opinion below, see 159 Fed. 206.

George D. Hay, B. Gordon Bromley, and Thomas De Witt Cuyler, for plaintiff in error.

J. Claude Bedford, for defendant in error.

Before DALLAS and GRAY, Circuit Judges, and ARCHBALD, District Judge.

GRAY, Circuit Judge. This is a writ of error to the court below, in respect of a judgment in a suit brought by the defendant in error, as administratrix of the estate of one John F. Finney, a citizen of the state of Pennsylvania, against the plaintiff in error, the Equitable Life Assurance Society of the United States, a corporation of the state of New York. The suit was brought to recover the sum of $32,500 on a policy of life insurance issued to the said John F. Finney in his lifetime, dated December 28, 1906.

The insurance was effected in pursuance of an application by the said Finney, dated October 10, 1906, which was signed by him and a copy thereof attached to the policy, so that under the act of the Legislature of the state of Pennsylvania, of May 11, 1881, it was not precluded from becoming a part of the contract between the parties in accordance with any agreement between them to that effect, or otherwise. This application contained the following stipulation:

"I hereby agree that this subscription, and the contract of sale hereby applied for, taken together, shall constitute the entire contract between the parties hereto; that all the statements and answers herein are warranted to be true; that this contract shall not take effect until the first installment has

been paid during my good health. I have not been declined or postponed by any life company or received a policy different in form from the one originally applied for, nor have I been intemperate or had any serious illness or disease except diseases incident to childhood, and there is no history of consumption or insanity in my family, i. e. among parents, brothers or sisters, uncles or aunts."

The following was also added:

"Note.—If applicant has ever been declined or postponed by any life company, or received a policy different from the form originally applied for, or been intemperate, or had any serious illness or disease other than childhood diseases, or if there is any history of insanity or consumption in applicant's family—among parents, brothers, sisters, uncles or aunts—state particulars here."

To this there was no answer. This stipulation became a part of the policy and of the contract between the company and the insured, clause 8 of the policy providing that:

"The entire agreement between the society and the purchaser is embodied in the contract of sale and the subscription (or application) therefor, taken together, which cannot be varied except in writing by one of the following executive officers of the society," etc.

The above recited agreement in the application, was a warranty of the truth of the statements therein contained, one of said statements being that the applicant had not had any serious illness or disease, except diseases incident to childhood. This court has already, as to an exactly similar clause in the application for a policy, incorporated by stipulation in the policy itself, used this language:—

"There can be no question that the statements made by the deceased in his application for insurance were warranties, and not mere representations or statements of belief, there being nothing in the language used in the whole instrument to indicate that the question between the insurer and insured was one merely of good faith and honest dealing, or of belief on the part of the insured in the truth of his statements." Doll v. Equit. Life Assur. Soc., 138 Fed. 705, 71 C. C. A. 121.

The defendant in the case just cited was the same as the defendant here, and the form of the application and policy were identical. Here, as in that case, there was an unqualified undertaking on the part of the insured, that the facts alleged by him were as he represented them to be, and the truth of such allegation was held to be a condition precedent to the performance of the obligation undertaken by the insurer.

At the conclusion of the evidence, the defendant moved the court to instruct the jury that, under all the evidence in the case, the verdict must be for the defendant, and the refusal to grant this motion is assigned as error. This assignment of error, and the argument of counsel in support of it, make it incumbent upon us to examine with care the evidence in the case, as sent up with the record, and consider whether it so clearly and unequivocally established, as a matter of law, the breach of the warranty made by the insured, as a condition precedent to the performance of the obligation undertaken by the other party to the contract, as to render the same invalid.

The evidence bearing on this question seems unusually clear. The warranty of the truth of the statement, that he had never had any illness or disease, except diseases incident to childhood, was made Octo-

ber 10, 1906, yet it is uncontrovertibly established by the evidence, that the insured, five years before, to wit, in October, 1901, had an illness which it is impossible to consider or describe as other than a serious one. It is not denied that the insured, Mr. Finney, was very ill during that month, but it is contended on behalf of the defendant in error, that it was not a serious illness within the meaning of those words in the warranty. There is no test or definition by which we can determine what those words in such a warranty may signify in a given case, other than the plain and ordinary meaning of the words themselves, and we must turn to the testimony and ascertain from it whether the illness of 1901 was serious, within the ordinary meaning of that word, as used in the warranty. On the 24th and 28th of October of that year, Dr. Hughes was called in consultation by Dr. Brown, the family physician. The following are extracts from his testimony:

"Q. Will you kindly describe what you observed when you called? A. Mr. Finney was partially conscious only, almost unconscious, and in an exceedingly weak state, and he had been complaining of a great deal of pain in the abdomen. Q. What was his condition when you saw him on this first visit? A. He was exceedingly ill. I thought he was going to die. Q. What were his symptoms? A. * * * Pain in the abdomen, collapse, which is extreme weakness, and almost complete unconsciousness. * * * Q. I would like if possible to hear some more comprehensive statements? A. When I saw him first, he was lying in bed unable to do anything for himself, unable to assist himself practically at all, lying prone, unable to sit up, unable I think, if I remember correctly, even to turn without assistance. He could scarcely be roused. When he was aroused, he could not be aroused to the point of making intelligible replies to questions. The pulse was weak. He was rather white, a little yellowish. There was a suspicion of a possibility of jaundice. The whites of his eyes were colored a little yellow. He was probably jaundiced a very little. Q. Did you arrive at any conclusion as to what was the cause of his trouble? A. I thought the first time I saw him that it was probably hemorrhagic pancreatitis. Hemorrhagic pancreatitis is a condition in which you find after death that the pancreas, which is an organ lying back of the stomach in the upper part of the abdomen, is infiltrated everywhere with blood. The condition very usually causes death. When I saw him the second time, I doubted the correctness of the original diagnosis, largely because he had improved. At that second examination I still thought there probably was some obscure disease of the pancreas, but probably not of a hemorrhagic type. * * * Q. Was his condition at the time of your first visit such as to indicate to your mind a possible fatal termination? A. I thought that there would be a fatal termination. Q. In other words, speaking from the standpoint of your general experience and knowledge, was his condition such that it might be denominated a severe sickness? A. A severe sickness, yes, sir. Q. A serious illness? A. Yes, surely. Anything that would apparently threaten life definitely would be a serious illness. Q. In hemorrhagic pancreatitis—which, as you have described, I believe is a suffusion of blood in the organ termed the pancreas? A. Yes. Q. What manifestations are there of that in the human anatomy? A. Those which I have detailed, sudden pain in the abdomen, with collapse, occurring without any other assignable cause. By the Court: Q. As I understand you, he did not have this? A. I presumed he did not have it, because he recovered. There have been reported cases in which recovery has ensued following the disease. That may be the result of faulty observation or there may be possibly a recovery from it. Q. Your judgment is there is no recovery from it? A. I have never seen a case that I knew to recover. The Court:—Why inquire into it, if Mr. Finney was not afflicted with it? The Counsel:—I want the symptoms of this disease, because the doctor did diagnose it, apparently, as that complaint in the first place. As the diagnosis has not shown that it was not that, except in so far as the doctor says he thought subsequently it was not by reason

of the man's recovery, I was getting the symptoms to see if it might not have been that disease in some stage of it. The Court:—You will have to assume it was not, if the doctor says it is his judgment it was not. The Witness:—I am not certain it was not. It might have been and there might have been a recovery. By the Counsel: Q. In other words, you are not sure at the present time it was not that in some form? A. I am not sure. Q. All that you are sure of is that the man was an exceptionally dangerously ill man? A. Yes. Q. And he was suffering from what you would call a serious illness or disease? A. Yes. sir. * * * X. Q. And the nearest you could come to it was that it came from the pancreas? A. Yes, sir. * * * Q. From the examination which you made of him at that time either the first or second time, can you say whether or not the illness, whatever it was, was functional or organic? A. It must have been organic. I doubt very much if any functional illness could have caused such decided symptoms. Q. Why do you say it must have been organic? A. A functional illness does not seriously threaten life. I say it was organic simply because he was too ill a man for any functional derangement to account for his condition."

Dr. Brown, in giving a history of the case, said:

"His pain was so acute that I gave him morphine, which had very little tendency to stop the pain. It did not stop it as I would like and I believe in four hours or so he had another one. He was slightly under the influence of morphine, but his condition was semi-conscious. He could be aroused, but did not talk intelligently, did not answer questions intelligently. When forced to take nutrition, he took it readily. If you opened his mouth and poured liquid in his throat he would swallow it, but you could see by the expression on the man's face that he was in acute pain, anxious. Coming out from the influence of the morphine a little bit, the first thing he would do was to put his hand on his abdomen and complain of pain again. That condition kept on until the evening Doctor Hughes saw him, when we did consider that night that Mr. Finney was in a serious condition. However, he improved. That night was a very anxious night. The next morning his condition seemed somewhat improved.. Following that return temporarily of consciousness in which he recognized me, very promptly following that recognition, he had a chill and another collapse. Just what that was caused by I never could tell. It looked then that the man was still seriously ill, but from that time on Major Finney made slow but sure, uninterrupted recovery, as I say, recovering without really a true diagnosis being made of his condition."

Dr. Brown further testified that Mr. Finney was, roughly speaking, ill five or six weeks. It will be observed that Dr. Hughes, the consulting physician whose opinion is deferred to by Dr. Brown, the family physician, diagnosed the case as "hemorrhagic pancreatitis," a disease so serious that Dr. Hughes says that it usually causes death, and his only reason for doubting the correctness of his diagnosis, was that the patient afterwards improved and finally recovered. He was ill for five or six weeks, and was attended by two physicians and a trained nurse. Whether this illness was correctly diagnosed as "hemorrhagic pancreatitis," or not, it would seem to have been beyond all question a serious illness, and one the recollection of which would have been impressed upon any man of the presumed intelligence and condition in life of Mr. Finney, who had been at one time United States Subtreasurer, and president of a banking institution. The serious character of such an illness is only emphasized by the fact that, though the attending physicians were apprehensive of a fatal result, they were unable to diagnose it to their satisfaction. Those to pass upon the risk proposed upon the life of the insured, had a right under their contract to know of such an illness, and if they had been properly informed, might well

have paused before accepting it. The medical history of the insured is also interesting in this connection. The testimony discloses the fact, and it is not denied or disputed, that the insured was, from 1888 to 1907, a sufferer from a diseased condition of the stomach, manifesting itself at various times in attacks of indigestion, nervous dyspepsia, gastritis, and gastric neurosis, prior to the serious illness of 1901. Dr. Stein testified that he attended the insured in the winter of 1888, for about four weeks, when he was ill with an attack of acute gastritis, and he afterwards attended him for a diseased stomach. Dr. Robinson testified that, between July, 1895, and February, 1899, he treated the insured more than ten times, for stomach derangement. While it lasted, he was confined to bed a week at a time, and was seriously ill; that it was a neuralgic condition of the stomach. Dr. Brown testified that, between December 18, 1900, and the date of the insured's death, in 1907, he treated him at least 100 times. The insured died of acute gastritis.

We think the learned judge of the court below has mistakenly allowed this evidence to so connect itself with the illness of 1901 as to influence his judgment of its serious character. We think, however, it only tends to support the charge of bad faith on the part of the insured, in his statement that he had never had any serious illness or disease, other than the diseases incident to childhood. But there is no ground at all for treating the illness of 1901 as an incident of the insured's general ill health. It was a distinct and serious illness, so characterized by the three attending physicians, who were apprehensive of fatal results, and whose testimony is nowhere impugned or contradicted. It would have been none the less a serious illness if it were really an acute attack of the patient's chronic gastric trouble. The learned judge of the court below has, we think, following the example of some state tribunals, mistakenly said that "the true construction of the language must be, that the applicant has never been so seriously ill as to permanently impair his constitution and render the risk unusually hazardous." To indulge in such refinement, is to fritter away the substantial value of such a warranty, and to invite in every case where the insurer has sought to so protect itself, the exercise of an ingenious and subtle casuistry to defeat the ordinary and obvious meaning of the words employed. We think, therefore, that the serious character of the illness of the insured, in 1901, was established by such clear and uncontradicted testimony, that the jury should not have been permitted to find otherwise.

The second question to be determined, is, whether under the act of assembly of Pennsylvania, of June 23, 1885 (P. L. 134), the statement by the insured, that he had never had any serious illness, etc., if made in good faith, related to a matter material to the risk. This act provides as follows:

"Whenever the application for a policy of life insurance contains a clause of warranty of the truth of the answers therein contained, no misrepresentation or untrue statement in such application, made in good faith by the applicant, shall effect a forfeiture or be a ground of defense in any suit brought upon any policy of insurance issued upon the faith of such application, unless such misrepresentation or untrue statement relates to some matter material to the risk."

As the court has heretofore held in Doll v. Equit. Life Assur. Soc., supra, the language of the application here under consideration, constituted an absolute warranty as to the truth of the statements, irrespective of the mere opinion or honest belief of the applicant. But in discussing the required materiality of such statement under the provision of the statute, just quoted, we must assume the good faith and honest belief of the insured in making the statement in question. We have already said that, in our opinion, the warranted statement, that the insured had had no serious illness, was untrue, and there was a consequent breach of warranty on the part of the insured. This breach would render void the obligation of the insurer, and forfeit the rights of the insured under the policy, unless the warranted statement was not material to the risk. What constitutes materiality under this statute, is probably sufficiently answered by the terse statement of the learned judge of the court below, in saying that "the jury on this point were charged that if any of the ailments, including the illness of 1901, were serious, they were material." The test of materiality must be sought at the time the question is asked, and the truth of the answer is warranted by the insured. It is from the point of view of the insurer at that time, that the materiality of the answer or statement of the applicant must be judged, and common sense and experience in the conduct of men in the ordinary affairs of life preclude even the suggestion, that the fact that the applicant had previously had a serious illness, was not material to the risk about to be assumed.

In Penn Mut. Life Ins. Co. v. Mechanics' Savings Bank, 72 Fed. 413, 428, 19 C. C. A. 286, 302, 38 L. R. A. 33, Judge Taft, speaking for the Circuit Court of Appeals, said:

"Materiality of a fact in insurance law is subjective. It concerns rather the impression which the fact claimed to be material would reasonably and naturally convey to the insurer's mind before the event and at the time the insurance is effected, than the subsequent actual causal connection between the fact or the possible cause it evidences, and the event. Thus it is by no means conclusive upon the question of the materiality of a fact that it was actually one link in a chain of causes leading to the event. Watson v. Mainwaring, 4 Taunt. 763; Jones v. Insurance Co., 3 C. B. (N. S.) 65; Rose v. Insurance Co., 2 Ire. 206; Insurance Co. v. Schultz, 73 Ill. 586. And on the other hand, it does not disprove that a fact may have been material to the risk because it had no actual subsequent relation to the manner in which the event insured against did occur. A fair test of the materiality of a fact is found therefore in the answer to the question whether reasonably careful and intelligent men would have regarded the fact communicated at the time of effecting the insurance as substantially increasing the chances of the loss insured against."

We agree with the opinion expressed by the learned judge of the court below, that the disclosure of a serious illness is necessary and material to the investigation made by the insurer as to the nature of the risk at the time the application is made by the insured. Where, in answer to the inquiry whether he had ever had a serious illness, etc., the applicant for insurance answers in the negative, and warrants the truth of his answer; whether the insurer would or would not have accepted the risk had the answer been otherwise, can only be a matter of conjecture, and is not relevant to the question, whether the answer and warranty related to a matter material to the risk. It was absolutely im-

portant and material that the company, about to pass upon a risk, should know of any serious illness in the past life of the applicant.

Constrained to the conclusion by the clear and uncontradicted testimony in this case, that the illness of the insured in 1901 was a serious illness, within the meaning of those words as used in the warranty, and that as such it was material to the risk, there was a breach of the warranty in question which avoided the obligation of the policy here in suit, and the jury should have been instructed on all the evidence to find for the defendant.

The judgment below is therefore reversed.